NORTHERN    PACIFIC    RAILWAY    COMPANY, v.
.WISCONSIN CENTRAL RAILWAY, COMPANY,
and Another.[1]

April 19, 1912.

Nos. 17,299—(23).

**Contract between railroad companies — consideration.**
An agreement, between the Northern Pacific Railway Company and the

[1] Reported in 135 N. W. 984.

Wisconsin Central Railway Company, concerning the use by the latter of a certain railroad bridge, owned by the former, over the St. Louis river, a navigable stream, *held* supported by a sufficient consideration, notwithstanding that such bridge was constructed under an act of Congress providing that the owner of such bridge shall admit all other companies to the use thereof upon equal terms, upon the payment of reasonable compensation for such use, and subject to such conditions and regulations as to method of use, etc., as shall be fixed by agreement of the parties, or, in default of such agreement, by the Secretary of War.

### Contract not contrary to statute.

Such agreement, though construed as a binding contract between the parties, *held* not contrary to the intent and purpose of such act of Congress, as tending to render the owner of the bridge incapable of complying with the mandate of the act as to the admission of all railroads to the use of such bridge upon equal terms, etc.

### Contract construed.

Such agreement construed, and *held* to be a contract which obligated the Wisconsin Central Railway Company to the payment of the rentals specified thereby, whether such company used the bridge or not.

Action in the district court for Ramsey county against the Wisconsin Central Railway Company and the Minneapolis, St. Paul & Sault Ste. Marie Railway Company, to recover $15,921.74 upon two contracts for the use of a certain drawbridge and terminals. The substance of the contracts is given in the opinion.

The amended separate answer of the Central Company admitted that "in compliance with an act of the Congress of the United States" "approved January 3, 1887," it executed the contract mentioned in the opinion as Exhibit A. It also admitted the execution of the contract called Exhibit B, and the execution on April 1, 1909, of the lease of the Central Company to the defendant Soo Company. It further alleged that a bridge was built pursuant to the act of Congress and had been operated by plaintiff and others ever since it was constructed; that there was no consideration paid to or received by the Central Company for the execution of Exhibit A; that no changes had been made by plaintiff in respect to the tracks described in Exhibits A or B, or such bridge, for the benefit or use of either

defendant, and plaintiff had not incurred any obligation or expense or foreborne to exercise any legal right which it otherwise could have exercised by reason of either Exhibit A or Exhibit B; that the track east of Grassy Point bridge described in Exhibit B was wholly located within the state of Wisconsin, no application had ever been made to the Railroad Commission of Wisconsin for a certificate of convenience and necessity authorizing either defendant to extend its line so as to include the track described in Exhibit B, no such certificate or a copy had ever been filed in the office of the Secretary of State of Wisconsin or of the register of deeds of the county where the tracks are located, and that none of the requirements of Wisconsin Laws 1907, c. 454, had ever been complied with in respect to such extension. It further alleged that prior to April 1, 1909, the Soo Company had duly arranged for the use of the bridge known as the Interstate bridge, which crosses the St. Louis river between the states of Wisconsin and Minnesota; that the line of the Soo Company connected directly with the line of the answering defendant and that the distance between the points of connection by way of the answering defendant's line and the Grassy Point bridge to the answering defendant's depot in Duluth was three and seven tenths miles longer than the distance over the lines of the defendant Soo Company to the same depot; that said Soo Company after it acquired possession and control of the tracks and terminal facilities of the answering defendant had ample track and terminal facilities for transacting all the business of both defendants in and out of the cities of Superior and Duluth, and much prompter and better service could be furnished the public over the lines of the Soo Company than by way of the Grassy Point bridge. That immediately after April 1, 1909, the answering defendant notified the plaintiff of the execution of the lease of its property to the Soo Company, and notified plaintiff that neither of the defendants could or would make any use of the Grassy Point bridge or of the track described in Exhibit B.

The amended separate answer of the Soo Company was substantially the same as that of the Central Company.

The case was tried before Dickson, J., who made findings and as conclusions of law ordered judgment that plaintiff take nothing by its cause of action based on Exhibit A for rent of the Grassy Point bridge; that plaintiff was entitled to judgment on its second cause of action for $1,749.93 rent and for $1,046.81, cash paid out for taxes and maintenance, and interest thereon. From the judgment in favor of plaintiff entered pursuant to the order for $3,057.12, plaintiff appealed.

Modified by adding thereto the amount due on contract described as Exhibit A, and remanded with direction to the trial court to proceed in accordance with this conclusion.

*C. W. Bunn* and *Emerson Hadley,* for appellant.

*John L. Erdall, M. D. Munn* and *A. H. Bright,* for respondents.

PHILIP E. BROWN, J.

This action is brought by the Northern Pacific Railway Company, hereinafter called the Pacific Company, against the Wisconsin Central Railway Company, hereinafter called the Central Company, and the Minneapolis, St. Paul & Sault Ste. Marie Railway Company, hereinafter called the Soo Company, to recover the compensation or rent reserved and provided for in two certain contracts or agreements entered into between the Pacific Company and the Central Company for the use of a certain drawbridge and the terminals thereof, and a certain piece of track to the east of the easterly approach to the said bridge, which said agreements are referred to in the complaint as Exhibit A and Exhibit B. The cause was tried by the court without a jury, findings were made in favor of the defendants upon Exhibit A, and in favor of the plaintiff upon Exhibit B. This is an appeal by the plaintiff from the judgment rendered upon such findings.

The following are the main facts of the case:

The said drawbridge, for the use of which the said contract (Exhibit A) was entered into, is known as the "Grassy Point Bridge," and crosses the St. Louis river, a navigable stream, between the city

of Superior, Wisconsin, and the city of Duluth, Minnesota. It was erected by the St. Paul & Duluth Railroad Company, the plaintiff's predecessor, under and pursuant to authority of an act of Congress entitled "An act to authorize the construction of a bridge across the St. Louis river at the most accessible point between the states of Minnesota and Wisconsin," approved January 3, 1887 [24 St. 356, c. 15]. Subsequently to the acquisition of the said bridge by the Pacific Company, and prior to June 4, 1907, the Central Company had located and was constructing a line of railway extending, among other places, between Duluth and Superior, respectively, as aforesaid, and desired to obtain from the Pacific Company the right to connect its line of railway with the easterly and westerly approaches to the aforesaid bridge; and to this end, on June 4, 1907, it entered into the agreement (Exhibit A) with the Pacific Company.

This agreement, after reciting the desire of the Central Company to connect with the line of the Pacific Company as above stated, and further reciting the Central Company's desire to obtain from the Pacific Company the right to use the aforesaid drawbridge and the approaches thereto  *  *  *  as a part of the Central Company's railway between the said cities of Superior and Duluth, and the willingness of the Pacific Company to grant such right upon the terms and conditions recited and to be recited in the agreement, and the value of the bridge, proceeds, in substance and effect, so far as is deemed material to the questions presented by this appeal, as follows:

First, That the Pacific Company "gives and grants" to the Central Company the right—to be enjoyed in common with the Pacific Company and such other railroad companies as may be hereafter admitted to the use of the said track and bridge—to connect its tracks with those of the Pacific Company at the easterly and westerly approaches to the said drawbridge, to enter upon such approaches for the purpose of making all such connections as shall be necessary to the full enjoyment of this "grant," and to run its trains over the said approaches and drawbridge.

Second. The Pacific Company reserves the right to lay new tracks and to alter the bridge or replace it with a new structure, in which case, however, the Central Company's rights shall not be affected, except as may result from the increased value of the bridge.

Third. The Central Company agrees to install, at its own expense and according to plans to be submitted to the Pacific Company, an interlocking and derailing apparatus, and to maintain and operate the same at its own expense.

Fourth. Provides for the regulation of the passage of trains arriving at the bridge at the same time.

Fifth. Provides for the reimbursement of the Central Company as to part of the cost of the interlocking and derailing apparatus, in the event of the admission of other companies to the use of the bridge.

Sixth. The Central Company shall "indemnify the Pacific Company against all loss, cost, damage, or expense of any kind which said last-named company may suffer, or for which it may become liable, resulting from any neglect or failure of the Central Company strictly to keep and perform all its covenants and agreements in this contract contained. It is mutually agreed between the parties hereto that each party shall bear and pay any and all loss and damage to its own property, and to property in its charge, and all loss and damage for any injury to or death of any of its employees, or of any person in its care as a carrier or otherwise, arising from the fault or negligence of any person employed in the operation of said interlocking and derailing plant, and each party shall bear and pay all loss and damage, claim, or recovery, resulting from the fault or negligence of its exclusive employees, and each party agrees to indemnify the other against and save it harmless from all such claims, loss, damage, and recovery which by the terms hereof it has assumed and agrees to pay, together with all costs, expenses, and attorney's fees incident thereto. All employees engaged in the operation of said interlocking and derailing plant shall, as to any question of responsibility for their acts and omissions, be deemed to be joint employees of the parties hereto."

Seventh. The Pacific Company will keep account of the expense

of all permanent improvements and additions to the bridge, and, "so long as only the two parties hereto use the property, the Central Company will pay unto the Pacific Company on the first day of each month, a minimum rental of six hundred twenty-five dollars ($625.00), to be increased from time to time so as to at all times equal half the interest upon the then value of the bridge and approaches, computed at five per cent per annum; but, if and when there shall be more than two users of the property, the rental shall be such part of the interest, so computed, as the number of wheels the Central Company moves over the same each month bears to the whole number of wheels of all users, the minimum rental, however, to be one-third of such interest.  Provided, however, that the maximum rental shall never exceed one-half of said interest."

Eighth.  "The Pacific Company shall keep and maintain in good order, condition, and repair the said bridge and approaches, and operate the same in such manner as to safely carry the traffic of the parties hereto," a certain proportion of the expense of such operation, etc., to be computed with reference to the number of users of the bridge, to be paid by the Central Company in addition to the aforesaid rental.

Ninth.  The parties agree to arbitrate disagreements that may arise as to the interpretation of this agreement.

Tenth.  "This agreement shall begin on the date when the Central Company commences to use the bridge, but upon January 1, 1909, whether it then uses the bridge or not, and shall continue twenty-five (25) years."

Eleventh.  "The grants, covenants, and stipulations hereof shall extend to and be binding upon the respective successors and assigns of the parties hereto."

Subsequently to the execution of this agreement, and on March 8, 1908, the Pacific Company and the Central Company entered into another agreement, entitled in the complaint as "Exhibit B," whereby the Pacific Company granted to the Central Company the right to use for the passage of its trains several thousand feet of the tracks of the Pacific Company in Superior, Wisconsin, lying just east of

the eastern approach to the said Grassy Point bridge, for which the Central Company agreed to pay a certain monthly rental, which said agreement was to "take effect on the day the Central Company commences to use said track, but not later than January 1, 1909, and shall continue in force for the term of three (3) years, and thereafter until either party shall give to the other one year's notice in writing of its desire to terminate the same." This contract or lease (Exhibit B) was entered into by the Central Company in part execution of a more general and comprehensive plan then in process of execution for the extension of its line into and across a portion of the state of Wisconsin.

But before the Central Company had availed itself of any of the rights and privileges purported to be granted by these two agreements, and without having made any use of the said track, bridge, or bridge terminals, the Soo Company succeeded to its property and rights, and assumed all its liabilities; and on June 4, 1910, the Soo and the Central Companies notified the Pacific Company of such succession, and, further, that neither of such companies, could or would make any use of the said Grassy Point bridge or the piece of track to the east thereof.

No changes, improvements, alterations, or repairs have ever been made in or upon the said bridge by the Pacific Company because or on account of the said contract (Exhibit A), or for the purpose of accommodating either of the defendants or to prepare the same for their use, and since the execution of the said agreement neither of the defendants have used or demanded the use of or attempted to use the said bridge, but have provided themselves with other facilities for crossing the said St. Louis river, and have not and do not now require the use of the said bridge. The consideration of one dollar, recited in the agreement (Exhibit A) as moving from the Pacific Company to the Central Company, was not paid.

1. The defendants' main contention is that the agreement, Exhibit A, for the use of the Grassy Point bridge, is without consideration. On this question there is no dispute concerning the facts. It

is admitted that the formal consideration of one dollar recited in the instrument as moving from the Pacific Company to the Central Company was not paid, that the like consideration recited as moving from the Central Company to the Pacific Company was not paid, and that neither the Central Company nor the Soo Company has made any use of the bridge. The sole consideration, therefore, consists in the mutual covenants and agreements contained in the instrument, and the benefits, if any, derived therefrom. Aside from the effect of some act of Congress affecting the rights of the parties in and to the use of this bridge, it is too clear for argument that the agreement in question is supported by a legal and sufficient consideration moving from the Pacific Company to the Central Company. As before stated, however, it appears that this bridge was constructed pursuant to an act of Congress, section 6 of which reads as follows [24 St. 357]:

"That all railroad companies desiring the use of said bridge shall have and be entitled to equal rights and privileges relative to the passage of railroad trains or cars over the same, and over the approaches thereto, upon payment of a reasonable compensation for such use; and in case the owner or owners of said bridge and the several railroad companies, or any one of them, desiring such use, shall fail to agree upon the sum or sums to be paid, and upon rules and conditions to which each shall conform in using said bridge, all matters at issue between them shall be decided by the Secretary of War upon a hearing of the allegations and proofs of the parties."

It is the defendants' contention that this act "expressly granted to the Central Company the right to use this bridge and approaches; that this act, as a condition precedent to the right to construct the bridge, imposed upon the predecessor of the Pacific Company, and the Pacific Company, the legal obligation and duty of permitting the Central Company to such use;" and "that the alleged grant to the Central Company of such right furnished no consideration for any agreement to pay the rentals sued for in this case in the absence of actual use." In other words, the defendants contend that the agreement (Exhibit A) purports to obligate the Pacific Company

117 M.—15.

merely to the performance of an existing legal obligation, and hence is without consideration.

It is unquestionably the law that the performance of or an agreement to perform an existing legal obligation is not alone a sufficient consideration for a contract, and the defendants' contention that the act under which this bridge was constructed is to be considered as a part of the contract entered into by the parties for its use is likewise well founded. If, therefore, as contended by the defendants, this agreement which we are considering, with the provisions of this act of Congress incorporated into it, grants to the Central Company no right, benefit, or privilege not already possessed by it by virtue of the provisions of such act, then the defendants' contention that such agreement is without consideration must, of course, be sustained. The determination of this question involves, therefore, a consideration of such act of Congress.

We find no authorities directly construing this act, but have been cited to a number of cases construing acts analogous thereto, and to these cases will refer later. The defendants' contention, as we understand it, is that the act of Congress in question gives to the defendants the absolute right to use the Grassy Point bridge upon payment of reasonable compensation for such use, and, further, that, as it is conceded that the compensation named in Exhibit A is a reasonable one, there was no consideration for such agreement. We cannot assent to this proposition. We think that this act of Congress contemplates that the owner of the Grassy Point bridge shall not act the part of the dog in the manger as to the excess capacity thereof. In other words, we think that the act gives any railroad company the right to use the bridge up to the fair limits of its capacity (Union Pacific Ry. Co. v. Mason City & Fort Dodge R. Co. 199 U. S. 160, 168, 26 Sup. Ct. 19, 50 L. ed. 134), but that before such use can be had the owner of the bridge and the company so desiring to use it must agree upon the compensation to be paid for such use, and upon the rules and conditions to which each shall conform in using the bridge, or else such matters must be determined by the Secretary of War as provided in the act, and that until

such agreement or such determination by the said secretary has been made the applying company has no right to the use of the bridge.

Can it be said, then, that the agreement (Exhibit A) is without consideration, when it makes certain that which is left uncertain by the act of Congress, when it makes personal and presently enforceable a right theretofore appertaining to the Central Company as an indeterminate member of a general class and not presently enforceable, and when it binds the Pacific Company to the present duty of admitting the Central Company to the use of the bridge for a determinate period? Can it be said that such an agreement is without consideration, or, in other words, that the agreement under consideration grants no right, benefit, or privilege not theretofore possessed by the Central Company by virtue of the provisions of the act of Congress? We think not. If the mutual covenants and agreements of Exhibit A do not constitute sufficient consideration each for the others, how could the requirement of the act of Congress that the parties must come to an agreement as to compensation, manner of use, etc., ever be carried out? If such an agreement is without consideration, what would prevent the owner of the bridge from repudiating it as soon as made, thus compelling the applicant to apply to the Secretary of War, and so on as often as any agreement is made? We do not think the act of Congress contemplates any such absurdity. We think its manifest intent to be that the parties shall, if possible, come to an agreement as to compensation, conditions of use, etc., and that such agreement, when made, shall be binding. We do not, of course, mean that the act necessarily contemplates more than a provisional agreement; but, on the other hand, we do not think that it precludes the parties from more fully and absolutely binding themselves, and, if a provisional agreement would be valid and binding, why not the absolute one by which the owner of the bridge grants the present right to use upon certain terms, etc., recited, while the other company at least impliedly undertakes and agrees to use the bridge upon such terms, etc.?

But, the defendants continually ask, what is the consideration for the Central Company's agreement to pay rent? This question we

think we have already answered by the comparison of this company's status with regard to the bridge with and without the agreement under consideration; but, if more need be said, we think it sufficient to advert to the manifest purpose of the Central Company in entering into this agreement. This company had certain extensions of its line in view. In order to carry out these plans, it had to get across the river. To this end it made the contract in question, and thereby cleared away all obstacles to the accomplishment of this part of their plans, and obtained assurance against delay that might be incident to the enforcement of its more or less indeterminate statutory right, and avoided the expense of an application to the Secretary of War; and thus it was ready to proceed with its extension without hindrance or delay. And it seems that it would have gone ahead with this extension, and availed itself of this contract, and probably even insisted upon its validity, had not its properties and rights been sold, in the meantime, to a company which did not need the use of the Grassy Point bridge.

It is true that in Union Pacific Ry. Co. v. Mason City & Fort Dodge R. Co. 199 U. S. 160, 26 Sup. Ct. 19, 50 L. ed. 134, the court held that the Mason City Company had a statutory right to use the Union Pacific Company's Omaha bridge over the Missouri river. It is likewise true that such court, in commenting upon the decision in Union Pacific Ry. Co. v. Chicago, Rock Island & P. Ry. Co. 2 C. C. A. 174, 51 Fed. 309, where the Circuit Court of Appeals affirmed the judgment entered in the Circuit Court (47 Fed. 15) primarily upon the contracts between the parties, adverted to another basis upon which the decree of the Circuit Court of Appeals was affirmed by the Supreme Court (163 U. S. 564, 16 Sup. Ct. 1173, 41 L. ed. 265), to wit, the statutory duty of the Union Pacific Company to let the Rock Island Company use the bridge; and it is true that the Supreme Court, in the Mason City case, declared that the contracts involved in the Rock Island case "might be regarded as simply relieving the court of the work of settling minor matters, such as method of use, compensation therefor, and matter of control." But it is to be noted that the court in this Mason City case

likewise recognized that its decision in the Rock Island case rested in part, at least, upon the contracts between the parties. The language of the court in this connection is: "Here the decision was rested, not simply on the contracts, but also on an obligation held to have been imposed on the defendant by the statutes of the United States." This, we think, clearly shows a recognition of the validity of such contracts, and robs its declaration, that such contracts might have been disregarded, of the significance attached thereto by counsel for the defendants in the case now before us.

Furthermore, the statute involved in these two Omaha Bridge cases was in a certain respect different from that under which the Grassy Point bridge was constructed, in that in the former there was no provision for an agreement between the parties as a condition precedent to the right of other companies to use the bridge. The provision there was that other companies should be allowed to use the bridge "for reasonable compensation, to be made to the owners of said bridge," and all that the Supreme Court held in the Mason City case was that the Mason City Company, having tendered such compensation, was entitled to use the bridge. We fail to see how this ruling can be successfully invoked as authority for the proposition that the parties, even under the statute involved in that case, might not have entered into a binding contract for the use of the bridge, had they seen fit to do so. Certainly we do not see how this ruling can militate against the validity of the contract for the use of the Grassy Point bridge, when the act under which such bridge was constructed expressly provides for an agreement between the parties, or its substitute, the appeal to the Secretary of War, as a condition precedent to the right of others than the owner to use the bridge.

2. What we have said in disposing of the defendants' first contention practically disposes of their second, to wit, that the Pacific Company could not make such a contract as that evidenced by Exhibit A, for the reason that such a contract would be inconsistent with the clearly expressed purpose of the act of Congress under which the Grassy Point bridge was constructed. Since, as we have already held, this act was intended merely to prevent the owner of

the bridge from making an arbitrarily monopolistic and discriminatory use of the bridge, we think it follows that the contract (Exhibit A) not only does not violate either the letter or the spirit of the act of Congress, but is just such a contract as was contemplated by Congress when it provided that other railroad companies desiring to use this bridge should come to an agreement with the owner thereof as to the compensation to be paid for such use and the conditions and regulations to be observed therein.

The only possible contention to the contrary rests upon the idea that the contract incapacitated the Pacific Company from obeying the mandate of the act of Congress that "all railroad companies desiring the use of said bridge shall have and be entitled to equal rights and privileges relative to the passage of railroad trains or cars over the same," etc., and we understand this to be the gravamen of the defendants' second contention. We have already adverted to the limitation with respect to capacity, which must be interpolated into this statutory provision, and, as so limited, it would seem that there is nothing in such provision to prevent the Pacific Company from entering into a bona fide contract with one or more other companies for the use of the entire excess capacity of this bridge over and above the needs of the Pacific Company's own traffic.

But, if there be doubt as to the correctness of this proposition, we think it is conclusively settled by the case of Union Pacific Ry. Co. v. Chicago, R. I. & Pac. Ry. Co. 163 U. S. 564, 16 Sup. Ct. 1173, 41 L. ed. 265, where an act of Congress and a contract closely analogous to the act and contract in this case were construed and adjudicated upon. In that case the Chicago, Rock Island & Pacific Railway Company, commonly called the Rock Island Company, sought specific performance of a certain trackage contract with the Union Pacific Railway Company, whereby the Pacific Company let the Rock Island Company "into the full, equal, and joint possession and use of its main and passing tracks, * * * including the bridge on which said tracks extend across the Missouri river, * * * for the term of nine hundred ninety-nine years," etc., and which further provided, after making provision for compensation, mode of

use, etc., that the Pacific Company might admit any other company to the use of the said bridge and tracks upon substantially the same terms, "provided such additional burden did not interfere with the Rock Island Company."

The Pacific Company resisted the performance of this contract on the ground, among others, that such contract was unauthorized, and to meet this contention the Rock Island Company invoked the provisions of the Bridge Act of 1866 (14 St. 244, c. 246), which provided that "when constructed all trains of all roads terminating at said river, at or opposite said point, shall be allowed to cross said bridge for reasonable compensation to be made to the owners of said bridge under the limitations and conditions hereinafter provided." The court held that this provision applied to the bridge in question in that case, and upheld the contract as being one calculated to carry out the intent and purpose of the provisions of the act of Congress cited.

"It is impossible for us to ignore the great policy in favor of continuous lines thus declared by Congress," said Mr. Chief Justice Fuller, in delivering the opinion of the court on this point, "and * * * it is in effectuation of that policy that such business arrangements as will make such connections effective are made. We are of opinion that it was within the powers of the Pacific Company to enter into contracts for running arrangements, including the use of its tracks, and the connections and accommodations provided for, and we cannot perceive that this particular contract was open to the objection that it disabled the Pacific Company from discharging its duties to the public. By the contract the Pacific Company parted with no franchise, and was not excluded from any part of its property, or the full enjoyment of it. What it agreed to do was to let the Rock Island into such use of the bridge and tracks as it did not need for its own purposes. This did not alien any property or right necessary to the discharge of its public obligations and duties, but simply widened the extent of the use of its property for the same purposes for which that property was acquired, to its own profit so far as that use was concerned, and in the furtherance of the demands

of a wise public policy. If, by so doing, it may have assisted a competitor, it does not lie in its mouth to urge that as rendering its contract illegal as opposed to public policy. Ability to perform its own immediate duties to the public is the limitation on its jus disponendi we are considering, and that limitation had no application to such a use as that in question."

Again, at page 590, the Chief Justice, in disposing of the defendant's contention that the contract would disable it from performing its charter duties to the public, continues: "It will not do to hold this contract void, and allow defendant to escape from the obligations it assumed, on the mere suggestion that at some time in the remote future there is a possibility that the suggested contingency might arise. Should it happen, however, the courts are competent to relieve from the consequences of so radical a change of condition."

We think this language is peculiarly applicable to the defendants' second contention in the case before us. It is true that the contract between the Union Pacific Company and the Rock Island Company involved the use of other tracks besides those on the Omaha bridge, and that the defendant's contention there was broader than that of the defendants' contention here, in that it was broadly contended that the nine hundred ninety-nine-year lease involved a surrender by the Union Pacific Company of its corporate powers and a disability to perform its corporate duties to the public; but we think the language quoted above nevertheless applicable to the contract in the case before us, for there the plaintiff successfully invoked in behalf of the contract an act of Congress analogous, for all present intents and purposes, to the act here invoked against the contract, and we do not see how we can arrive at any other conclusion than that arrived at by the Supreme Court of the United States in the Rock Island case, to wit, that the contract is calculated to carry into effect the very purpose of the act of Congress, and cannot be upset upon the remote contingency of future complications that may possibly arise by reason of future applications by other companies for the right to use the bridge. Chicago, R. I. & P. Ry. Co. v. Union Pacific Ry. Co. (C. C.) 47 Fed. 15, 23. And we are unable to understand how the fact

that the defendants here will not avail themselves of the provisions of their contract can possibly increase the probability of such future complications or in any way militate against the validity of the contract.

If we were in doubt as to the correctness of our understanding of the decision in the Rock Island case, our doubt would be settled by reference to what Mr. Justice Brewer said in delivering the opinion of the court in the Mason City case, supra, in referring to the Rock Island case. He says, at 199 U. S. 165, 26 Sup. Ct. 20, 50 L. ed. 134: "Indeed, the alleged invalidity of the contracts was rested largely upon the scope of the statutes, and the duties to the government and the public imposed thereby on the railroad company." Again at page 165, he says, still referring to the Rock Island case, supra: "Here the decision was rested, not simply on the contracts, but also on an obligation held to have been imposed on the defendant by the statutes." And again at page 166, he says: "Of course, where there are two grounds, upon either of which the judgment of the trial court can be rested, and the appellate court sustains both, the ruling on neither is obiter, but each is the judgment of the court, and of equal validity."

This language, we think, clearly shows that the court, in the Mason City case, recognized the language of the court in the Rock Island case as applying to the effect of the Omaha Bridge act. Such being the case, we think that the Rock Island case, supra, is conclusive against the defendants' second contention, and therefore we must hold that the contract (Exhibit A) does not contravene the intent and purpose of or any limitation imposed by the act of Congress under which the Grassy Point bridge was constructed.

3. The defendants' third contention is that the contract (Exhibit A) "was not intended to and does not obligate the Central Company either to use this bridge or to pay the compensation named for a period of twenty-five years, but was simply an arrangement entered into by the parties pursuant to and as required by the act of Congress, settling minor matters, such as compensation and method of use."

That this contention is not well founded is, we think, too plain for argument. The preliminary recitals of the contract are that the Central Company had already located and was constructing a line of railway which would extend between Duluth and Superior; that the said company "desires to obtain * * * the right to connect," etc. (not "may desire or may wish"), with the approaches of the said bridge, and that it "desires * * * to obtain from the Pacific Company the right to use its aforesaid drawbridge * * * as part of the Central Company's railway between said cities of Superior and Duluth;" and then the contract proceeds to grant these rights which the Central Company desired to obtain, and in paragraph 10 provides that the contract shall take effect on January 1, 1909, "whether [the Central Company] then uses the bridge or not, and shall continue twenty-five years." In view of these recitals, and the plain and unambiguous provisions of the contract, we fail to see how it can be doubted that it was the intention of the parties to this agreement to make a binding contract, and not a merely provisional one.

But it may be noted that the contract (Exhibit B) entered into some months later, and which granted the Central Company the right to use a certain piece of track just to the east of the bridge, contains the same provision as to when it shall take effect, whether the track is then used by the Central Company or not, and the same date, January 1, 1909, is fixed upon. Does this not show that these two contracts were intended to complete the Central Company's plans for extending its line between Superior and Duluth, and that, but for the intervening acquisition by the Soo Company of the rights and properties of the Central Company, there never would, in all probability, have been any contention, at least on the part of the Central Company, that this contract (Exhibit A) was not final, absolute, and binding? We hold that this contract was intended as, and is, a contract between these parties, and not a merely provisional agreement or understanding.

Such being the case, and this agreement having been held otherwise valid, the conclusion necessarily follows that the Central Com-

pany must be held to the obligations assumed thereby. As was said by Mr. Justice Brewer, in Chicago, R. I. & P. Ry. Co. v. Union Pacific Ry. Co. (C. C.) 47 Fed. 15, 30: "It is to the higher interest of all, corporations and public alike, that it be understood that there is a binding force in all contract obligations, that no change of interest or change of management can disturb their sanctity or break their force, but that the law which gives to corporations their rights, their capacities for large accumulations, and all their faculties, is potent to hold them to all their obligations, and so make right and justice the measure of all corporate as well as individual action."

The judgment must be modified, by adding thereto the amount due on the contract referred to in the record as Exhibit A, and the cause be remanded, with direction to the trial court to proceed in accordance with this conclusion.

So ordered.