*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1374**

Rahn's Oil & Propane, Inc.,
Respondent,

vs.

Ettel Logistics, Inc., et al.,
Defendants,

ELI Logistics, Inc., et al.,
Appellants.

**Filed June 1, 2015
Affirmed
Larkin, Judge**

Stearns County District Court
File No. 73-CV-12-9149

John L. Greer, John F. Mathews, James P.A. Morrighan, Hughes Mathews Greer, P.A., St. Cloud, Minnesota (for respondent)

David T. Johnson, Amundson & Johnson, P.A., Paynesville, Minnesota (for appellants)

Considered and decided by Schellhas, Presiding Judge; Larkin, Judge; and Reyes, Judge.

UNPUBLISHED OPINION

**LARKIN**, Judge

In this appeal from judgment following a court trial of respondent's claims to recover on a debt owed by appellants, appellants assert that the district court erred in its resolution of respondent's claims under the Minnesota Uniform Fraudulent Transfer Act (MUFTA). We affirm.

**FACTS**

Respondent Rahn's Oil & Propane Inc. sued appellants ELI Logistics Inc., Michael Ettel, Judith Ettel, and Frederick Ettel, claiming that appellants are liable under MUFTA for a fuel bill incurred by Ettel Logistics Inc.[1] The district court held a court trial and made findings of fact, which are summarized below.

Ettel Logistics was a trucking company that operated from October 2008 until July 2011. Its business included milk-hauling routes. Kristine Kussman, Michael's wife, was the sole shareholder, officer, and director of Ettel Logistics. Michael and Kussman owned the property from which Ettel Logistics operated. They agreed that Michael would not be a shareholder of the company because he had a substantial tax debt, but they planned to make Michael a co-owner after he paid off the debt. Although Michael was not an owner, he managed the trucking operations, was involved in important decisions for the company, and held himself out to other companies as an owner or officer of Ettel Logistics.

---

[1] Respondent included additional defendants and claims in the lawsuit, but those defendants have not appealed and the additional claims are not at issue.

Ettel Logistics had an account with Rahn's Oil for the purchase of fuel. David Rahn, an owner of Rahn's Oil, originally believed that Kussman and Michael owned Ettel Logistics. Kussman and Michael approached Rahn together to open the account, and Rahn regularly dealt with Michael, and not Kussman.

In November 2010, Michael and Kussman divorced. Shortly thereafter, Ettel Logistics began issuing checks to Rahn's Oil that were not honored by the bank. Between December 2010 and February 2011, Ettel Logistics issued eight such checks, and its account with Rahn's Oil accumulated a past-due balance of $74,740.63. Rahn tried to discuss the debt with Michael, but Michael told him that Kussman was responsible for financial matters. When Rahn explained why he thought Michael was responsible for the debt, Michael told Rahn that he was "going to have to take [Michael] to court."

As Ettel Logistics' business began to fail, Michael's parents, Judith and Frederick, provided financial assistance in an attempt to save it. They personally guaranteed loans to Ettel Logistics in the amount of $195,243.49.

In spring 2011, Kussman began negotiating with the Ettels to sell them Ettel Logistics. The Ettels pressured Kussman to "ensure that Mike and his parents were taken care of" and not to sell the milk-hauling routes or contracts to anyone else. During negotiations, Michael estimated the value of the annual income from the milk routes to be $481,370. Kussman valued the income at $610,000.

In July 2011, Ettel Logistics transferred its assets to ELI Logistics Inc., a company owned and directed by Judith and managed by Michael. The written asset-purchase

3

agreement states a purchase price of $596,681.79 "plus any amounts due under equipment lease with Financial Pacific Leasing."[2] The agreement states that the purchase price is "allocated entirely to equipment," and it does not assign any value to the milk-hauling contracts. The agreement also states that "[p]ayment of purchase price is in the form of assumption of debt by [b]uyer" and provides that ELI would assume all bank debt owed by Ettel Logistics. But under the language of the agreement, ELI did not assume Ettel Logistics' debt to Rahn's Oil. The agreement provided that Ettel Logistics was entitled to accounts receivable up to and including the July 22 milk routes, which amounted to $52,000. Finally, Kussman was required to sign a quit claim deed regarding her interest in the real property on which the business was located and received less than $500 for it.

Judith testified that she would not have purchased the business if she had not personally guaranteed nearly $200,000 in loans to help fund Ettel Logistics. Frederick testified that, because Ettel Logistics was failing, he and his wife were afraid they would lose their house, which they had put up as collateral for the loans.

Throughout the negotiations and sale of the business, Ettel Logistics continued to incur debt with Rahn's Oil. By the date of the sale, Ettel Logistics owed Rahn's Oil $120,654.50. None of the appellants told Rahn about the sale of Ettel Logistics until seven days after it occurred. After the sale, Kussman told Rahn that she did not know how she could repay him. Rahn's Oil obtained a default judgment against Ettel Logistics

---

[2] The district court did not make findings regarding any amounts due under the equipment lease with Financial Pacific Leasing.

4

in the amount of $122,191.95 and docketed the judgment in September 2011. In October 2011, Ettel Logistics published Notice of Intent to Dissolve as a corporation to creditors. Rahn's Oil mailed a Notice of Claim to Ettel Logistics, alleging a claim in the amount of $196,932.58 for the default judgment, statutory interest, and statutory penalties for dishonored checks.

Rahn's Oil commenced the underlying action under MUFTA in September 2012. Robert Covell, a certified valuation analyst and certified public accountant, testified for Rahn's Oil. He conducted a business valuation of Ettel Logistics and determined that the value of the assets transferred from Ettel Logistics to ELI was $788,682. Covell testified that the price Ettel Logistics received for its assets was not reasonably equivalent to the value of its assets. Covell did not conduct his own appraisal of the trucks and equipment, but arrived at a value of $596,682 based on the language of the written agreement, which allocated the entire purchase price to the trucks and equipment. Covell concluded that the milk contract rights were worth $192,000.

James Kloster, a machinery and equipment appraiser, testified for appellants. He conducted a valuation of the equipment transferred under the agreement and concluded that the transferred assets were worth $375,000. He did not opine regarding the value of the milk routes or the business as a whole.

The district court concluded that the asset transfer from Ettel Logistics to ELI was actually and constructively fraudulent under MUFTA. The district court further concluded that it was "appropriate to pierce the corporate veil" and that "[h]olding [appellants] personally liable for this fraud is an equitable result." The district court

5

ordered judgment for Rahn's Oil in the amount of $120,654.50 and ordered that appellants and Kussman are jointly and severally liable for that amount.[3] Appellants moved for amended findings or a new trial, and the district court denied the motion. This appeal follows.

## D E C I S I O N

### I.

The purpose of MUFTA is "to prevent debtors from placing property that is otherwise available for the payment of their debts out of the reach of their creditors." *Finn v. Alliance Bank*, 860 N.W.2d 638, 644 (Minn. 2015) (quotation marks omitted). To fulfill this purpose, "MUFTA allows creditors to recover assets that debtors have fraudulently transferred to third parties." *Id.* "To cover the variety of situations in which debtors may attempt to place assets beyond the reach of creditors, MUFTA allows creditors to recover assets that a debtor transfers with fraudulent intent" under Minnesota Statutes section 513.44(a)(1) (2014), "as well as those transfers that the law treats as constructively fraudulent" under sections 513.44(a)(2) (2014) and 513.45 (2014). *Id.*

In this case, the district court concluded that the transfer of assets from Ettel Logistics to ELI was constructively fraudulent under Minnesota Statutes sections 513.44(a)(2)(ii) and 513.45(a). Section 513.44(a)(2)(ii) provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . *without receiving a reasonably equivalent*

---

[3] Kussman has not appealed.

6

*value in exchange for the transfer or obligation*, and the debtor: . . . intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

(Emphasis added.)

Section 513.45(a) provides:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation *without receiving a reasonably equivalent value in exchange for the transfer or obligation* and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(Emphasis added.)

Appellants argue that "the [district] court's finding that the assets were sold for less than reasonably equivalent value was clearly erroneous and not supported by the evidence" and that "[s]ince the assets were not sold for less than reasonably equivalent value, [Rahn's Oil] cannot recover under Minn. Stat. § 513.44(a)(2) or Minn. Stat. § 513.45(a)."

"Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the [district] court to judge the credibility of the witnesses." Minn. R. Civ. P. 52.01. "[Appellate courts] examine the record to see if there is reasonable evidence in the record to support the court's findings. And when determining whether a finding of fact is clearly erroneous, [appellate courts] view the evidence in the light most favorable to the verdict. To conclude that findings of fact are clearly erroneous [an appellate court] must

7

be left with the definite and firm conviction that a mistake has been made." *Rasmussen v. Two Harbors Fish Co.*, 832 N.W.2d 790, 797 (Minn. 2013) (quotations and citations omitted).

The district court's finding that the asset transfer was for less than a reasonably equivalent value is based on the following reasoning. The purchase price of $596,681.79 was the exact amount that Ettel Logistics owed Freeport State Bank and Central Minnesota Credit Union. Judith "paid" for the purchase by assuming the debt that Ettel Logistics owed Freeport State Bank and Central Minnesota Credit Union. But Judith acknowledged that she was already responsible for $195,243 of that debt. Therefore, she actually assumed only $401,438 of new debt in the transfer and effectively paid only that amount. The district court accepted Covell's testimony that the milk routes were worth $192,000 and found that ELI paid nothing for them. The district court reasoned that, even if it accepted Kloster's assessment that the transferred equipment was worth only $375,000, the business was still worth at least $567,000. And because the Ettels received a business that was worth $567,000 in exchange for assuming $401,438 in new debt, the exchange was for less than a reasonably equivalent value.

Appellants argue that the equipment transferred from Ettel Logistics to ELI is worth between $337,225 and $375,000, and urge this court to accept Kloster's appraisal. But the district court accepted Kloster's appraisal of the equipment and used his figure of $375,000 in finding that the business was worth at least $567,000. Appellants argue that the district court erred when it accepted Covell's testimony "that there is an additional value of $192,000 for the milk routes when these routes were included in the original

8

$596,682 purchase price." But the district court found that ELI paid nothing for the milk routes, and the written asset-purchase agreement supports this finding. It states, "The purchase price is hereby allocated entirely to equipment." Appellants argue that the "allocation is just an agreement among the parties as to how the parties should treat the sale for tax purposes." Although there may be support for appellants' theory in the language of the agreement, the district court's finding is reasonable, and on appeal, this court reviews "the evidence in the light most favorable to the verdict." *Rasmussen*, 832 N.W.2d at 797.

Appellants also argue that the district court erred in finding that Judith assumed only $401,438 in new debt. Specifically, appellants assert that the district court erred by not including "the pre-existing personal guaranty of $195,243" in the purchase price, because "[i]t was only a guarantee." Appellants contend that the $195,243 was not a preexisting debt, and they generally argue that "[i]t is unsure whether Frederick and Judith Ettel would have ever been responsible for this amount. The bank could have pursued this amount from Frederick and Judy Ettel, but they might not have. [The bank] had other remedies to pursue before pursuing the personal guarantees." But appellants do not cite legal authority to show that the district court erred by treating Judith's personal guaranty as a preexisting debt.

Rahn's Oil counters that a "guaranty" is "[a] promise to answer for the payment of some debt, . . . in case of the failure of another who is liable in the first instance," citing *Black's Law Dictionary* 712 (7th ed. 1999). Rahn's Oil cites *N. Pac. Ry. Co. v. Wis. Cent. Ry. Co.*, which states that "[i]t is unquestionably the law that the performance of or an

9

agreement to perform an existing legal obligation is not alone a sufficient consideration for a contract." 117 Minn. 217, 226, 135 N.W. 984, 986 (1912). Rahn's Oil concludes that "Judith Ettel's liability to Freeport State Bank was a preexisting obligation which cannot constitute consideration for the assets."

Because appellants do not offer legal support for their assertion of error based on the district court's treatment of Judith's preexisting personal guaranty as preexisting debt, and we do not discern obvious error, this issue is waived. *See State v. Modern Recycling, Inc.*, 558 N.W.2d 770, 772 (Minn. App. 1997) ("An assignment of error based on mere assertion and not supported by argument or authorities in appellant's brief is waived and will not be considered on appeal unless prejudicial error is obvious on mere inspection." (quotation omitted)).

In sum, the district court's finding that Ettel Logistics' assets were transferred to ELI for less than reasonably equivalent value is supported by reasonable evidence in the record and is not clearly erroneous.

**II.**

Appellants argue that the district court erred in concluding that the asset transfer was made with actual fraudulent intent under Minnesota Statutes section 513.44(a)(1). Section 513.44(a)(1) provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: . . . with actual intent to hinder, delay, or defraud any creditor of the debtor.

10

"Because the intent to defraud creditors is rarely susceptible of direct proof, courts continue to rely on badges of fraud to determine whether a transfer is fraudulent." *Citizens State Bank Norwood Young Am. v. Brown*, 849 N.W.2d 55, 60 (Minn. 2014) (quotation marks omitted). Consideration may be given to, among other factors, whether:

> (1)  the transfer or obligation was to an insider;
> (2)  the debtor retained possession or control of the property transferred after the transfer;
> (3)  the transfer or obligation was disclosed or concealed;
> (4)  before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
> (5)  the transfer was of substantially all the debtor's assets;
> (6)  the debtor absconded;
> (7)  the debtor removed or concealed assets;
> (8)  the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
> (9)  the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
> (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
> (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Minn. Stat. § 513.44(b) (2014).

The district court found that six badges of fraud are present in this case. It found that the transfer was to an insider because the Ettels, particularly Michael, exercised control over Ettel Logistics along with Kussman, and remained in control of ELI, the new corporation. The district court found that the transfer was concealed because Rahn's Oil was not informed of the sale until seven days after it occurred. Although Rahn did not

11

threaten Ettel Logistics with a lawsuit before the transfer, the district court found that Michael was aware of the possibility of a lawsuit because he told Rahn that Rahn was "going to have to take [him] to court." The district court also found that the transfer was of substantially all of Ettel Logistics' assets, the value of the consideration received by Ettel Logistics was not reasonably equivalent to the value of the assets transferred, and Ettel Logistics was insolvent at the time of the transfer. Additionally, the district court found that Michael was insincere regarding his role in the business and his knowledge regarding Ettel Logistics' debt to Rahn's Oil, which the district court treated as "another indication of actual intent to defraud [Rahn]."

Appellants contest those findings. They argue that the Ettels were not all insiders, there are "a number of other factors that the court did not properly consider," the court failed to consider the timing of events, the transfer was not concealed just because Rahn did not find out about it, there was no threat of a lawsuit, Ettel Logistics retained assets in the form of accounts receivable, the court did not properly blame Kussman for mismanagement, and the district court did not properly analyze reasonably equivalent value.

Our standard of review is as follows:

> In an appeal from a bench trial, we do not reconcile conflicting evidence. We give the district court's factual findings great deference and do not set them aside unless clearly erroneous. However, we are not bound by and need not give deference to the district court's decision on a purely legal issue. When reviewing mixed questions of law and fact, we correct erroneous applications of law, but accord the [district] court discretion in its ultimate conclusions and

12

review such conclusions under an abuse of discretion standard.

*Porch v. Gen. Motors Acceptance Corp.*, 642 N.W.2d 473, 477 (Minn. App. 2002) (alteration in original) (quotations and citations omitted), *review denied* (Minn. June 26, 2002). Applying that standard to our review of the record evidence, we do not discern clear error in the district court's findings regarding the badges of fraud. *See Wilson v. Moline*, 234 Minn. 174, 182, 47 N.W.2d 865, 870 (1951) (stating that appellate courts need not "discuss and review in detail the evidence for the purpose of demonstrating that it supports the trial court's findings").

Appellants also assert, "[f]or actual fraud to be found, facts supporting a conspiracy against [Rahn] must be present" and "[t]here simply were no such facts." But appellants do not provide legal authority to support their argument that there must be proof of a conspiracy to defraud. The issue is therefore waived. *See Modern Recycling*, 558 N.W.2d at 772.

## III.

Appellants argue that the district court erred in determining that an antecedent debt need not be owed to an insider to satisfy the requirements of Minnesota Statutes section 513.45(b) (2014), which provides:

> A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

13

In district court, appellants argued that Rahn's Oil could not establish liability under section 513.45(b) because it requires that the transfer be made to an insider for an antecedent debt owed to the insider and the transfer here was made for a debt owed to third parties, Freeport State Bank and Central Minnesota Credit Union. The district court rejected that argument based on the plain language of the statute, reasoning that the statute merely requires that assets were transferred to the insider "for an antecedent debt."

"Interpretation of a statute presents a question of law, which we review de novo." *Swenson v. Nickaboine*, 793 N.W.2d 738, 741 (Minn. 2011). When interpreting a statute, our objective is to "ascertain and effectuate the intention of the legislature." Minn. Stat. § 645.16 (2014). "[An appellate court] first look[s] to see whether the statute's language, on its face, is clear or ambiguous. A statute is ambiguous only when the language therein is subject to more than one reasonable interpretation." *Am. Family Ins. Grp. v. Schroedl*, 616 N.W.2d 273, 277 (Minn. 2000) (quotation and citation omitted). "If the legislature's intent is clearly discernible from a statute's unambiguous language, appellate courts interpret the language according to its plain meaning, without resorting to other principles of statutory construction." *City of St. Paul v. Elderidge*, 788 N.W.2d 522, 525 (Minn. App. 2010), *aff'd*, 800 N.W.2d 643 (Minn. 2011).

Appellants do not contend that section 513.45(b) is ambiguous. Instead, they argue that the "plain language of this statute requires that the transfer was made to an insider for an antecedent debt *owed to the insider*." But the statute does not contain the phrase "owed to the insider." It only states that "the transfer was made to an insider for an antecedent debt." Minn. Stat. § 513.45(b). We may not add the words "owed to the

14

insider" to the statute. *See Wallace v. Comm'r of Taxation*, 289 Minn. 220, 230, 184 N.W.2d 588, 594 (1971) ("[C]ourts cannot supply that which the legislature purposely omits or inadvertently overlooks."). Because the plain language of section 513.45(b) does not require that the antecedent debt be owed to the insider, the district court did not err in applying the statute.

**IV.**

Appellants contend that the district court erred in failing to "impose the defenses set forth in Minn. Stat. § 513.48(e)(2) [(2014)]." Section 513.48(e)(2) states: "A transfer is not voidable under section 513.44(a)(2) or 513.45 if the transfer results from . . . enforcement of a security interest in compliance with article 9 of the Uniform Commercial Code."

Appellants only argument on this issue is as follows: "Here, the antecedent referred to was a debt to Freeport State Bank, which had a security interest. Even if the antecedent debt is not required to be payable to an insider, this statute provides a defense to the court['s] conclusions." Appellants do not identify any evidence in the record showing that the transfer of assets from Ettel Logistics to ELI resulted from enforcement of a security interest in compliance with article 9 of the Uniform Commercial Code. This issue is waived for lack of adequate briefing and because it was raised for the first time in appellants' motion for amended findings and a new trial. *See Modern Recycling*, 558 N.W.2d at 772; *Ellingson v. Burlington N. R.R. Co.*, 412 N.W.2d 401, 405 (Minn. App. 1987) (stating that a party may not raise an issue for the first time in a motion for a new trial), *review denied* (Minn. Nov. 13, 1987).

15

## V.

Appellants argue that the district court "erred in determining that [they] were 'insiders' pursuant to Minn. Stat. § 513.41-513.45." Appellants' entire argument on this issue is as follows:

> This issue has been analyzed . . . above. Insider status must be considered at the time of the transaction. Not whether the Ettels may have been somehow insiders in the past. Also, it must be noted that there were no findings at all pertaining to Frederick Ettel. And he, too, was found to be an insider.

Contrary to appellants' argument, the district court's findings address Frederick Ettel's role in the underlying events. The district court's findings of fact note that Michael testified that the milk hauling and trucking business "has always been in the family" and that his father (Frederick) and grandfather had run milk-hauling routes. The findings also note that "Frederick testified that he and his wife were afraid they would lose their house, which they had put up as collateral, because Ettel Logistics was failing." The district court found that "[a]s Ettel Logistics began to fail, Judith and Frederick provided financial assistance in an attempt to save it" and that "Judith and Frederick had personally guaranteed loans originated to Ettel Logistics through Freeport State Bank in the amount of $195,243.49." The district court found that "Kussman met with Michael, Judith and Frederick to discuss potential solutions to Ettel Logistics' financial problems" and that Kussman e-mailed Freeport State Bank "with a list of ideas that had purportedly come out of that meeting." The list included "getting Fred and Judy's liability reduced as

16

much as possible." The e-mail also noted that "Fred and Judy agree that we need to drop the freight expenses as soon as possible."

In addition, the district court's conclusions of law include approximately two full pages of text explaining its determination that appellants are insiders. A portion of that explanation follows:

> While the names of the businesses have changed, as have the owners and shareholders, the Ettel family has been behind each incarnation of the milk hauling business before the Court in this trial. Michael testified that "the business has always been in the family." His father and grandfather ran milk hauling routes. Michael ran his own trucking business until 2005 when he and Mark [his uncle] formed Ettel Transport, Inc. Michael's assets, including milk routes, from Ettel Transport were then used to build and run Ettel Logistics. Now Judith Ettel owns ELI, which Michael runs. It is the Ettels, and not Ms. Kussman, who have a long history in the milk hauling business, and when each incarnation of the business fails, the Ettels reinstitute that business under the leadership of someone new. In the case of Ettel Logistics, that person was Ms. Kussman.

The record adequately supports the district court's findings regarding insider status, and the findings support the district court's attendant conclusions of law. Moreover, we do not discern error in the district court's legal analysis regarding this issue. This court does not presume error on appeal. *See White v. Minn. Dep't of Natural Res.*, 567 N.W.2d 724, 734 (Minn. App. 1997) (stating that error is never presumed on appeal), *review denied* (Minn. Oct. 31, 1997). The burden is on appellants to show that the district court erred and that prejudice resulted. *See Midway Ctr. Assocs. v. Midway Ctr., Inc.*, 306 Minn. 352, 356, 237 N.W.2d 76, 78 (1975) (stating that to prevail on appeal, an appellant must show both error and prejudice resulting from the error).

17

Appellants have not shown that the district court erred in its determination that appellants are insiders.

In conclusion, appellants have not met their burden to establish reversible error on appeal. We therefore affirm.

**Affirmed.**