STATE OF MINNESOTA

IN SUPREME COURT

A12-1257

| | |
|---|---|
| Court of Appeals | Wright, J. |
| | Concurring, Page, J. |
| | Concurring, Anderson, J. |

Citizens State Bank Norwood Young
America,

    Respondent,

vs.                 Filed:  July 9, 2014
               Office of Appellate Courts

Gordon Brown, et al.,

    Appellants.

_____

Alan M. Albrecht, Gavin, Winters, Twiss, Thiemann & Long, Ltd., Glencoe, Minnesota; and

John A. Halpern, John A. Halpern & Associates, Minneapolis, Minnesota, for respondent.

Amie E. Penny Sayler, Messerli & Kramer P.A., Minneapolis, Minnesota; and

Robert M. McClay, McClay and Alton, PLLP, Saint Paul, Minnesota, for appellants.

_____

S Y L L A B U S

Minnesota's Uniform Fraudulent Transfer Act applies to transfers made pursuant to an uncontested marital dissolution decree.

Affirmed in part, reversed in part.

1

WRIGHT, Justice.

Respondent Citizens State Bank Norwood Young America (Bank) seeks to set aside, under Minnesota's Uniform Fraudulent Transfer Act (MUFTA), certain transfers made between appellants Gordon[1] and Judy Brown pursuant to their uncontested marital dissolution judgment and decree. The district court granted summary judgment to the Bank, and the court of appeals affirmed. We granted the Browns' petition for further review to address whether MUFTA applies to fraudulent transfers made pursuant to an uncontested marital dissolution decree. We now conclude that MUFTA applies to such transfers and that the record supports the district court's findings that Gordon Brown made certain transfers with the intent to defraud his creditors. We, therefore, affirm the district court's judgment that sets aside the transfers and allows the Bank to levy execution on assets fraudulently transferred to the extent necessary to satisfy the Bank's claim. However, to the extent the district court's decision pertains to assets that were not transferred, we reverse.

I.

Gordon Brown guaranteed certain commercial loans that the Bank made to TCB Tool Corporation and Cool Air International. Both TCB Tool and Cool Air defaulted on their respective loans, and Gordon Brown failed to satisfy his obligations under his personal guarantee. On January 8, 2010, the Bank sued Gordon Brown to enforce the

---

[1]     Pursuant to Minn. R. Civ. App. P. 143.02, the court was notified by counsel for the Browns that Gordon Brown died during the pendency of this appeal.

personal guarantee. Gordon Brown's wife Judy Brown was not named as a party to the lawsuit. The district court entered a default judgment against Gordon Brown on June 29, 2010. The judgment authorized the Bank to collect the remaining balance on the two loans plus interest, costs, and attorney fees.

While the Bank's lawsuit was pending, Gordon Brown petitioned to dissolve his 23-year marriage to Judy Brown. At that time, he was 93 years old and Judy Brown was 55. The Browns subsequently executed a marital termination agreement (MTA) on October 5, 2010. The district court judge in the dissolution case found the MTA to be "fair and reasonable" and incorporated its terms into a dissolution judgment and decree entered on October 13, 2010. After the divorce,[2] the Browns continued to live together.

Under the dissolution judgment and decree, Gordon Brown was awarded the Browns' home, valued in the dissolution judgment and decree at $421,900; his 1999 Cadillac; the rights to his 401(k) worth less than $140,000; a checking account, valued at less than $3,000; and corporate stock, valued at less than $80,000. He also accepted sole responsibility for joint debt obligations worth more than $270,000. In addition, Gordon Brown retained personal guarantee obligations of approximately $8.8 million, which he had entered into alone.

Pursuant to the dissolution judgment and decree, Gordon Brown transferred to Judy Brown an RBC Wealth Management account, valued at approximately $1.2 million,

---

[2] We use the terms "dissolution" and "divorce" interchangeably throughout this opinion. *See* Minn. Stat. § 518.002 (2012) (providing that the terms "divorce" and "dissolution" have the same meaning in Minnesota Statutes).

and his one-half interest in Pontoon Partnership, which owned a commercial property as its only asset. These two assets that Gordon Brown transferred to Judy Brown secured a $1.1 million Minnesota Bank and Trust (MB&T) loan. Judy Brown retained her MB&T savings account valued at $84,000.

The Bank was unable to collect from Gordon Brown on the original judgment and brought this action under MUFTA, Minn. Stat. §§ 513.41-.51 (2012), to levy execution on the assets Gordon Brown transferred to Judy Brown. The Bank alleged that the transfers were made with the intent to defraud the Bank because the transfers exhibited six of the eleven factors enumerated in Minn. Stat. § 513.44(b). The Browns responded separately, denying the allegations in the complaint.

The Bank moved for summary judgment, which the district court granted based on the conclusion that the Browns "engaged in actual fraud as shown by the existence of a number of [badges of fraud]." The district court specifically found that Gordon Brown transferred assets to an insider, concealed the transfers from the Bank, transferred substantially all of his assets, did not receive reasonably equivalent value for the transfers, became insolvent after the transfers, and transferred the assets shortly after his debt to the Bank became delinquent. The district court rejected the Browns' argument that the transfers were not fraudulent because they were made pursuant to a marital dissolution decree, observing that the decree was entered pursuant to the Browns' voluntary MTA. Accordingly, the district court determined that the transfers were voidable under MUFTA.

The Browns appealed. The court of appeals affirmed the decision of the district court. *Citizens State Bank Norwood Young Am. v. Brown*, 829 N.W.2d 634, 642 (Minn. App. 2013). After concluding that MUFTA applies to transfers made pursuant to an uncontested marital dissolution decree, the court of appeals applied the common law presumption that transfers made between spouses are fraudulent, *id.* at 639-40, and determined that the undisputed facts "support[] a singular conclusion that the Browns had actual intent to defraud" the Bank, *id.* at 638.

We granted the Browns' petition for review.

## II.

Laws allowing creditors to void fraudulent transfers trace their origins to the Statute of 13 Elizabeth, adopted in England in 1571. 1571, 13 Eliz., c. 5; *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 540 (1994). *See generally* Unif. Fraudulent Transfer Act prefatory note, 7A U.L.A. pt. 2, at 4 (2006). The statute allowed creditors to void transfers designed "to delay, hinder or defraud creditors and others." 13 Eliz., c. 5. English courts relied on "badges of fraud"—certain suspicious circumstances that frequently accompanied fraudulent transfers—to determine whether a transfer was fraudulent. *See BFP*, 511 U.S. at 540-41; *Twyne's Case*, (1601) 76 Eng. Rep. 809 (Star Chamber) 812-14; 3 Co. Rep. 80b, 81a. These badges of fraud included that the debtor retained possession of the property after the transfer, made the transfer in secret, or made the transfer after being sued. *Twyne's Case*, 76 Eng. Rep. at 812-14; 3 Co. Rep. at 81a.

5

American states later embraced fraudulent transfer law. *See, e.g.*, Va. Rev. Code, ch. 101, ¶ 2 (1819); *see also* Isaac A. McBeth & Landon C. Davis III, *Bulls, Bears, and Pigs: Revisiting the Legal Minefield of Virginia Fraudulent Transfer Law*, 46 U. Rich. L. Rev. 273, 277 (2011). And Minnesota's territorial legislature enacted Minnesota's first such law in 1851.[3] Minn. Rev. Terr. Stat., ch. 64 (1851). This territorial law provided that "[e]very conveyance . . . made with the intent to hinder, delay or defraud creditors . . . shall be void." *Id.*, § 1.

Seeking to standardize these laws, the Conference of Commissioners on Uniform State Laws promulgated the Uniform Fraudulent Conveyance Act in 1918. Unif. Fraudulent Transfer Act prefatory note, 7A U.L.A. pt. 2, at 4. Minnesota adopted the Uniform Fraudulent Conveyance Act in 1921. Act of Apr. 20, 1921, ch. 415, 1921 Minn. Laws 642. The Uniform Laws Commission updated the uniform law in 1984 with the Uniform Fraudulent Transfer Act, which Minnesota adopted in 1987. Unif. Fraudulent Transfer Act prefatory note, 7A U.L.A. pt. 2, at 5-7; *see also* Act of Apr. 7, 1987, ch. 19, 1987 Minn. Laws 28.[4] MUFTA's purpose is aligned with that of Minnesota's predecessor laws—to prevent debtors from placing property that is otherwise available

---

[3] The Minnesota Territory operated under the Wisconsin Territory's fraudulent transfer law until it adopted its own in 1851. Act of Mar. 3, 1849, ch. 121, § 12, 9 Stat. 403, 407 (providing that the laws of the Wisconsin Territory apply to the Minnesota Territory unless modified or repealed by Minnesota's territorial legislature); Fraudulent Conveyance Act, tit. III, § 1, Wis. Terr. Stat. 161, 164 (1839) (voiding fraudulent conveyances).

[4] Forty-three states and the District of Columbia have adopted versions of the Act. Unif. Fraudulent Transfer Act, 7A U.L.A. pt. 2, at 1-2 tbl. (Supp. 2013).

for the payment of their debts out of the reach of their creditors. *Kummet v. Thielen*, 210 Minn. 302, 306, 298 N.W. 245, 247 (1941).

To that end, MUFTA includes both actual and constructive fraud provisions. *See* Minn. Stat. §§ 513.44, .45.[5] The actual fraud provision, at issue in this case, requires the fact-finder to conclude that the debtor made a transfer "with actual intent to hinder, delay, or defraud any creditor." Minn. Stat. § 513.44(a)(1). Because the intent to defraud creditors is rarely susceptible of direct proof, courts continue to rely on "badges of fraud" to determine whether a transfer is fraudulent. *Shields v. Goldetsky* (*In re Butler*), 552 N.W.2d 226, 231 (Minn. 1996) (citing Unif. Fraudulent Transfer Act prefatory note, 7A U.L.A. 639 (1985)). Badges of fraud in MUFTA include a transfer made to an "insider" or transfers that comprise "substantially all the debtor's assets." Minn. Stat. § 513.44(b)(1), (5).

III.

A threshold question that we must address is whether MUFTA applies to transfers made pursuant to an uncontested marital dissolution decree. We review this question of statutory interpretation de novo. *See Clark v. Lindquist*, 683 N.W.2d 784, 785 (Minn. 2004). In construing MUFTA, our charge is to ascertain and effectuate the intention of the Legislature. *Schatz v. Interfaith Care Ctr.*, 811 N.W.2d 643, 649 (Minn. 2012); *see also* Minn. Stat. § 645.16 (2012). We construe nontechnical words and phrases according to their plain meanings. *Staab v. Diocese of St. Cloud*, 813 N.W.2d 68,

---

[5] MUFTA's constructive fraud provisions allow a creditor to void a transfer without proving that the debtor intended to defraud a creditor. Minn. Stat. §§ 513.44(a)(2), .45.

7

72 (Minn. 2012) (citing Minn. Stat. § 645.08(1) (2012)). "[W]hen the words of a law . . . are clear and free from all ambiguity, the letter of the law shall not be disregarded under the pretext of pursuing the spirit." *Haghighi v. Russ.-Am. Broad. Co.*, 577 N.W.2d 927, 929 (Minn. 1998) (quoting Minn. Stat. § 645.16) (internal quotation marks omitted).

Minnesota Statutes § 513.44(a)(1) provides that "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer . . . with actual intent to hinder, delay, or defraud any creditor." The term "transfer" is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset." Minn. Stat. § 513.41(12). Because a transfer made pursuant to an uncontested marital dissolution decree is a mode of "disposing of or parting with" assets, it falls within the statutory definition of "transfer."

Our construction is consistent with other states' interpretations of the Uniform Fraudulent Transfer Act. This is significant to our analysis because, "[u]niform laws are interpreted to effect their general purpose to make uniform the laws of those states that enact them." *Johnson v. Murray*, 648 N.W.2d 664, 670 (Minn. 2002) (citing Minn. Stat. § 645.22 (2012)). "Accordingly, we give great weight to other states' interpretations of a uniform law." *Id.* at 670. Several states have concluded that their versions of the Act apply to an uncontested marital dissolution decree. *See, e.g.*, *Mejia v. Reed*, 74 P.3d 166, 174 (Cal. 2003) ("[California's] UFTA applies to property transfers under [marriage settlement agreements]."); *Estes v. Titus*, 751 N.W.2d 493, 495 (Mich. 2008) (holding that Michigan's UFTA "applies to a transfer of property made pursuant to a property settlement agreement incorporated in a divorce judgment"); *Fadel v. El-Tobgy*, 264 P.3d

8

150, 155-56 (Or. Ct. App. 2011) (concluding that transfers of assets during a divorce can violate Oregon's UFTA). Indeed, our research has produced no legal authority to the contrary.

Although MUFTA provides exclusions for contributions "made to a qualified charitable or religious organization" as defined under Minn. Stat. § 513.41(12), a similar exception to the definition of "transfer" made pursuant to an uncontested marital dissolution decree does not exist. And we construe enumerated exceptions in a law to exclude all others. *In re Estate of Braa*, 452 N.W.2d 686, 688 (Minn. 1990); *see also* Minn. Stat. § 645.19 (2012). Accordingly, we do not exempt transfers made pursuant to an uncontested marital dissolution decree from the statutory definition of "transfer" in Minn. Stat. § 513.41(12).

We, therefore, hold that a transfer made pursuant to an uncontested[6] marital dissolution decree may be set aside as fraudulent under MUFTA. In doing so, we do not reach the broader question of whether MUFTA applies to contested marital dissolution decrees.

IV.

Having determined that MUFTA applies to uncontested marital dissolution decrees, we next consider whether the district court erred by entering summary judgment in favor of the Bank. We review a district court's decision to grant summary judgment

---

[6]    In this case, our reference to the marital dissolution decree as "uncontested" means that there was no genuine dispute between the parties as to the value or disposition of marital assets.

9

de novo to determine whether any genuine issue of material fact exists and whether the district court correctly applied the law. *Stringer v. Minn. Vikings Football Club, LLC*, 705 N.W.2d 746, 754 (Minn. 2005); *see also* Minn. R. Civ. P. 56.03. Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, establishes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *Odenthal v. Minn. Conference of Seventh-Day Adventists*, 649 N.W.2d 426, 429 (Minn. 2002). To defeat a summary judgment motion, the nonmoving party must do more than rest on averments or denials of the adverse party's pleadings. Minn. R. Civ. P. 56.05. Rather, when the moving party makes out a prima facie case, the burden of establishing that the facts raise a genuine issue falls to the opposing party. *Thiele v. Stich*, 425 N.W.2d 580, 583 (Minn. 1988).

Historically, in a contest between a wife and the creditors of her husband, a presumption of fraudulent conveyance existed that required affirmative proof to rebut. *See, e.g.*, *Minneapolis Stock-Yards & Packing Co. v. Halonen*, 56 Minn. 469, 471, 57 N.W. 1135, 1135-36 (1894). This presumption continued under the Uniform Fraudulent Conveyance Act. *Kummet*, 210 Minn. at 305, 298 N.W. at 246. Under MUFTA, however, whether a transfer is made to a spouse or other "insider" is one of eleven badges of fraud provided in Minn. Stat. § 513.44(b)(1). *See* Minn. Stat. §§ 513.41(7)(i)(A), (11), .44(b)(1). Here, we need not decide whether the marital presumption survives the adoption of MUFTA because we conclude that the Browns were not spouses at the time of the transfers.

10

Several badges of fraud are relevant to this appeal: (1) "the transfer . . . was to an insider"; (2) "the transfer was of substantially all the debtor's assets"; (3) the debtor failed to receive reasonably equivalent value for the asset transferred or obligation incurred; (4) "the debtor was insolvent or became insolvent shortly after the transfer was made"; (5) "before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit"; (6) "the transfer occurred shortly before or shortly after a substantial debt was incurred"; and (7) "the debtor retained possession or control of the property transferred after the transfer." Minn. Stat. § 513.44(b).[7] In analyzing these factors, we are mindful that the definition of asset "does not include . . . property to the extent it is generally exempt under nonbankruptcy law." Minn. Stat. § 513.41(2)(ii).

## A.

We first consider whether the transfers were to an "insider." Minn. Stat. § 513.44(b)(1). Spouses fall within the definition of "insiders." Minn. Stat. § 513.41(7)(i)(A), (11). The Bank argues, and the lower courts held, that Judy Brown was Gordon Brown's spouse at the time of the transfers. However, under MUFTA's definition of when a transfer of personal property occurs, the operative point in time is when the transfer is "so far perfected that a creditor on a simple contract cannot acquire a judicial lien" without resort to MUFTA. Minn. Stat. § 513.46(1)(ii). The Browns were

---

[7] The Bank no longer argues that the transfers were concealed because they were not disclosed, an argument that the court of appeals rejected in its consideration of the case. *Citizens State Bank Norwood Young Am.*, 829 N.W.2d at 641. Accordingly, we do not address that badge of fraud in our analysis.

still spouses when they signed the MTA. However, the assets that Gordon Brown subsequently transferred to Judy Brown were not yet beyond the reach of a contract creditor. Therefore, Gordon Brown did not transfer the assets within the meaning of MUFTA when he and Judy Brown signed the MTA. Rather, the transfers occurred, at the earliest, when the Dakota County District Court entered the dissolution judgment and decree, which simultaneously dissolved the Browns' marriage. *See* Minn. Stat. § 518.06, subd. 1 (2012) (providing that a dissolution of marriage terminates the marital relationship between spouses). Accordingly, the Browns were not spouses when they transferred the assets.

Our conclusion that the Browns were not spouses when the transfers were made, however, does not preclude a finding that Judy Brown was an insider. The definition of " '[i]nsider' *includes* . . . a relative." Minn. Stat. § 513.41(7)(i)(A) (emphasis added). In this context, the term "includes" indicates that the definition is nonexclusive. *LaMont v. Indep. Sch. Dist. No. 728*, 814 N.W.2d 14, 19 (Minn. 2012). In addition, the comments to the Act provide that "a court may find a person living with an individual for an extended time in the same household or as a permanent companion to have the kind of close relationship intended to be covered by the term 'insider.' " Unif. Fraudulent Transfer Act § 1, 7A U.L.A. pt. 2, at 17 cmt. 7 (2006). The Browns were married for 23 years, and they continued to live with one another after their divorce, demonstrating a continued close relationship. The Browns contend that "[i]n today's economy, it is often the case that economic factors make it impossible for divorced spouses to live separately." But the Browns submitted no evidence that either spouse was financially

12

incapable of living on his or her own after the divorce. Indeed, the evidence demonstrates otherwise. The dissolution judgment and decree establishes that, after the divorce, Gordon Brown owned the marital home and Judy Brown had a substantial positive net worth. The Browns must do more than rest on "general averments" to rebut specific facts showing that they continued to have a close relationship after their divorce. Minn. R. Civ. P. 56.05. Rather, they must "present specific facts showing that there is a genuine issue for trial." *Id.* On the record before us, they failed to do so.

The Connecticut Supreme Court addressed a similar question in *Canty v. Otto*, 41 A.3d 280 (Conn. 2012). In *Canty*, a creditor sued the debtor's former spouse under Connecticut's Uniform Fraudulent Transfer Act. *Id.* at 285. The creditor sought to set aside transfers made between the defendant and the debtor in their divorce. *Id.* The *Canty* court concluded that "the transfer of [the debtor's] property to the defendant—his former wife with whom he continued to reside—constituted transfers to an insider." *Id.* at 294. Here, the Browns also continued to live together after their divorce. They have presented no evidence showing that their previously close relationship changed. Based on these undisputed facts, the district court properly concluded that Gordon Brown's transfers to Judy Brown were to an insider.

B.

The district court and the court of appeals concluded that Gordon Brown transferred substantially all of his assets in the divorce, which constitutes another badge of fraud. *See* Minn. Stat. § 513.44(b)(5). The Browns argue that this conclusion is erroneous because, after the dissolution, Gordon Brown owned the home, valued at

13

$421,900, and his 401(k) account, valued at less than $140,000. However, the definition of "assets" under MUFTA excludes "property to the extent it is generally exempt under nonbankruptcy law." Minn. Stat. § 513.41(2)(ii). Therefore, to determine whether Gordon Brown transferred substantially all of his assets, we do not consider exempt property. A debtor's 401(k) is exempt from creditors' claims. 29 U.S.C. §§ 1003(a), 1056(d)(1) (2012); *Patterson v. Shumate*, 504 U.S. 753, 759-60 (1992). This exemption is not capped at a designated amount. 29 U.S.C. § 1056(d)(1); *Patterson*, 504 U.S. at 759-60. Consequently, Gordon Brown's 401(k) is not an asset for purposes of MUFTA. Similarly, at the time of the dissolution, a homestead was exempt up to a value of $360,000. Minn. Stat. §§ 510.01, 510.02, subd. 1 (2012); 34 Minn. Reg. 1460, 1461 (Apr. 26, 2010). Therefore, only $61,900 of the home's value is an asset under MUFTA. Moreover, Gordon Brown executed a quitclaim deed in October 2009, transferring the home to Judy Brown one year before the marital dissolution decree was entered. Thus, Gordon Brown did not transfer the home to Judy Brown pursuant to the dissolution judgment and decree. Judy Brown transferred it to him.

The record establishes that, before the divorce, Gordon Brown had the following nonexempt assets: a checking account with a balance of less than $3,000; corporate stock, valued at $80,000; an RBC account, valued at approximately $1.2 million; and a one-half interest in Pontoon Partnership, with a net value of approximately $300,000.[8]

---

[8] It is difficult to pinpoint the precise value of the interest in Pontoon Partnership at the time of the dissolution. The partnership's sole asset was a commercial property, which, according to the MTA, was listed for sale for $1.7 million at the time of the

(Footnote continued on next page.)

Therefore, the value of Gordon Brown's assets before the dissolution exceeded $1.5 million. Of these assets, Gordon Brown transferred all but the checking account and the corporate stock. Accordingly, because Gordon Brown transferred substantially all of his assets, another badge of fraud is present.

## C.

The next badge of fraud found by the district court is Gordon Brown's failure to receive reasonably equivalent value for the assets he transferred. *See* Minn. Stat. § 513.44(b)(8). "Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied . . . ." Minn. Stat. § 513.43(a). The Browns do not argue that any debt was secured or satisfied pursuant to the divorce. We, therefore, consider the property that Judy Brown transferred to Gordon Brown when analyzing whether she gave reasonably equivalent value for the transfers Gordon Brown made and the obligations he incurred. As addressed in section IV.B. of this opinion, the value of assets Gordon Brown transferred to Judy Brown was approximately $1.5 million (the one-half interest in Pontoon Partnership, valued at approximately $300,000, and the RBC account, valued at approximately $1.2 million).

(Footnote continued from previous page.)
dissolution. The property, along with the RBC account, also secured a $1.1 million MB&T loan. The Browns argue that summary judgment for the Bank was improper in part because "the value of the Pontoon Partnership interest that Judy received was not established." But the Browns' MTA indicates that the net value of the property at the time of the dissolution was $600,000, and the Browns presented no evidence to support a determination that the value provided in the MTA was inaccurate. Therefore, for purposes of this analysis we consider the net value of Gordon Brown's one-half interest in the partnership at the time of the dissolution to be approximately $300,000.

By contrast, the only property that Judy Brown transferred to Gordon Brown was the home valued at $421,900—$360,000 of which was exempt. In light of the fact that Gordon Brown also assumed sole responsibility for more than $270,000 of the Browns' joint debt obligations, we conclude that Gordon Brown did not receive reasonably equivalent value in exchange for assets worth approximately $1.5 million that he transferred to Judy Brown.

D.

We next consider whether "the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred." Minn. Stat. § 513.44(b)(9). Under MUFTA, a debtor is insolvent if "the sum of the debtor's debts is greater than all of the debtor's assets." Minn. Stat. § 513.42(a). Because the definition of "insolvent" uses the term "asset," exempt property is not included in determining whether Gordon Brown was insolvent after the transfers. *See* Minn. Stat. § 513.41(2)(ii). It is clear that after the divorce Gordon Brown was insolvent. Gordon Brown's assets after the divorce included a checking account valued at less than $3,000, corporate stock valued at less than $80,000, and the non-exempt value of the home. In addition, Gordon Brown held more than $270,000 of marital debt. Gordon Brown, therefore, had a negative net worth even without accounting for the nearly $9 million in personal guarantee obligations he retained. In light of these facts, the district court correctly concluded that Gordon Brown was insolvent after the transfers.

16

E.

Likewise, there is no genuine issue of material fact that Gordon Brown had been sued or threatened with a lawsuit when the marital dissolution decree was entered. *See* Minn. Stat. § 513.44(b)(4). The Bank sued Gordon Brown on January 8, 2010, to enforce his personal guarantee. Approximately nine months later, in October 2010, the Browns signed the MTA, and the dissolution judgment and decree was entered shortly thereafter.

F.

The next badge of fraud we consider is whether the transfers "occurred shortly before or shortly after a substantial debt was incurred." Minn. Stat. § 513.44(b)(10). The parties and the district court agree that Gordon Brown incurred a debt to the Bank on June 29, 2010—the date that the default judgment was entered in the original lawsuit. For the purpose of addressing this badge of fraud, we accept June 29, 2010, as the date the debt was incurred. The transfers occurred on October 13, 2010, following entry of the marital dissolution decree. The Browns argue that they had no control over when the marital dissolution decree was entered. But this argument is unavailing because Gordon Brown set the transfers in motion when he petitioned to dissolve the Browns' marriage on March 15, 2010. When Gordon Brown initiated the transfers, he already had been sued by the Bank and reasonably would have anticipated that he would soon incur a substantial debt. Therefore, we conclude that the transfers were initiated shortly before and actually were made shortly after a substantial debt was incurred.

17

G.

The final factor that we consider is whether "the debtor retained possession or control of the property transferred after the transfer." Minn. Stat. § 513.44(b)(2). The parties dispute whether Gordon Brown retained control of the RBC account after the divorce. The Bank presented copies of statements of the RBC account showing that Gordon Brown's name appeared on the account several months after the divorce. But statements from the RBC account submitted by the Browns establish that Judy Brown's name was on the account by October 2011. Despite the existence of a factual dispute on this final issue, we conclude that summary judgment was proper.

Whether a creditor made a transfer with fraudulent intent is ordinarily a question of fact. *See Underleak v. Scott*, 117 Minn. 136, 141, 134 N.W. 731, 733 (1912). But when no genuine issue of material fact exists, the district court may decide the question as a matter of law on a motion for summary judgment. *See id.* at 141, 134 N.W. at 733; *see also* Minn. R. Civ. P. 56.03. Here, six of the eleven badges of fraud were established. The presence of a single badge of fraud may, but does not necessarily, prove fraudulent intent. *See, e.g.*, *In re Coffey's Case*, 949 A.2d 102, 120 (N.H. 2008); *Gilchinsky v. Nat'l Westminster Bank N.J.*, 732 A.2d 482, 490 (N.J. 1999). The presence of several badges of fraud, however, creates an inference of fraud that requires clear evidence of a legitimate purpose to rebut. *In re Coffey's Case*, 949 A.2d at 120. The Browns have failed to rebut this inference. Accordingly, the district court did not err by concluding that Gordon Brown transferred assets in the divorce with the intent to defraud his creditors.

18

The district court erred, however, by allowing the Bank to levy execution on Judy Brown's MB&T savings account. It is evident from the dissolution judgment and decree that the MB&T savings account was in Judy Brown's name before the dissolution, and she retained the account in the property division ordered in the marital dissolution decree. As the MB&T savings account was not transferred, it is not a fraudulent transfer to be voided. We, therefore, reverse this aspect of the district court's decision. However, because the record establishes that Gordon Brown transferred the RBC account and his Pontoon Partnership interest in the divorce, the district court properly authorized the Bank to levy execution on these assets.

V.

In summary, we conclude that MUFTA applies to transfers made pursuant to an uncontested marital dissolution decree. The transfers at issue here exhibit several badges of fraud and provide conclusive proof of fraudulent intent. On these facts, we affirm the district court's judgment granting the Bank authority to levy execution on the fraudulently transferred assets to the extent necessary to satisfy the Bank's claim.

Affirmed in part, reversed in part.

# CONCURRENCE

PAGE, Justice (concurring).

I concur in the result.

CONCURRENCE

ANDERSON, Justice (concurring).

I concur in the majority opinion, but I write separately to emphasize the unusual nature of the facts in this case that support summary judgment. What makes this case a candidate for summary judgment is the complete absence of any genuine issues of material fact, including the absence of any indication of adversity between Gordon Brown and his wife in the context of the dissolution of their marriage and the absence of any evidence indicating that the transfers were made for a legitimate purpose rather than to defraud Gordon Brown's creditors.

The question of insider status will normally be a disputed issue requiring a finder of fact. *See In re Petters Co., Inc.*, 499 B.R. 342, 366 (Bankr. D. Minn. 2013) ("Because non-insider status is fact-intensive, a plaintiff-trustee's assertion of it is not to be finally determined on a motion to dismiss as long as sufficient facts have been pleaded toward the two considerations."). In my view, not much is required to move an "uncontested" divorce proceeding into the adversarial category. Indeed, the presence of financial pressure because of collapsing business interests is frequently a contributing factor in a marriage dissolution. But many contested, disputed, or adversarial marriage dissolutions, with varying degrees of intensity, eventually become "stipulated" for purposes of dissolving the marriage. Thus, the fact that a divorce is labelled "stipulated" or appears uncontested in the final proceeding does not necessarily mean that the divorce was not adversarial. And in adversarial divorces, even adversarial divorces that are eventually labelled "stipulated," it may well be that the former spouse receiving the transfer does not

C-1

have insider status, thus eliminating one badge of fraud. *See* Minn. Stat. § 513.44(b)(1) (2012) (listing insider status as a badge of fraud). But all the facts here point away from the conclusion that the dissolution was even remotely adversarial, and thus there is no genuine issue of material fact about whether the transfer in this case was made to an insider.

Similarly, the presence of multiple badges of fraud does not mean summary judgment for the creditor is automatically warranted. Badges of fraud serve as indicators that the debtor intended to commit fraud. *See Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254-55 (1st Cir. 1991) ("The presence of a single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evidence of an actual intent to defraud . . . ." (citation omitted)). But, as the majority notes, any presumption created by the presence of badges of fraud can be rebutted by evidence that shows the party's actual intent was not to defraud creditors and that the transfer was made for some legitimate purpose. *Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1354 (8th Cir. 1995) (noting that badges of fraud "can constitute conclusive evidence of actual intent to defraud, *absent 'significantly clear' evidence of a legitimate supervening purpose*") (emphasis added) (citation omitted) (internal quotation marks omitted)). For example, it is not difficult to imagine the circumstance of a business owner in deep financial trouble, who enters into a stipulation terminating the marriage on terms that look more favorable to his or her spouse, but fully expects the business enterprise to recover and intends to be able to pay back creditors after that recovery. "Near death" experiences for businesses are hardly rare, and so a transfer

during dissolution may not necessarily indicate intent to defraud creditors. In addition, our family courts properly take into account a variety of factors including the age, occupation, health, skills, employability, and needs of each party to a marital dissolution. Minn. Stat. § 518.58, subd. 1 (2012). Thus, what may look like a transfer to hide or preserve assets to an outside creditor or a court reviewing on summary judgment, may in fact be a perfectly reasonable dissolution of marriage based on the specific situations of those involved and have nothing to do with avoiding creditors.

Therefore, the question of a party's intent to defraud creditors through a marriage-dissolution transfer will often be a question of fact to be resolved by a fact-finder even when badges of fraud are present, and not an issue that can be decided on summary judgment. Here, however, the Browns largely chose to focus on legal arguments relating to judicial duties in reviewing dissolution decrees rather than submit evidence of actual intent. The absence of evidence regarding a legitimate purpose for the transfers is such that not only have the Browns failed to rebut the presumption of fraud established by the badges, the Browns have failed to even create a genuine issue of fact.

Thus, while summary judgment in favor of the creditor will normally be inappropriate because of the number of fact-intensive issues presented in a case like this one, here, there is no evidence creating genuine issues of fact on the claims of insider status or a legitimate purpose for the transfer of assets. Because no genuine issue of material fact exists, I agree that summary judgment is appropriate in this case. Therefore, I join in the majority opinion, but note that caution should be the watchword when evaluating summary judgment motions in spousal transfer cases where fraud is alleged.