REILLY, Judge
Appellant-landowner challenges the district court's grant of summary judgment in favor of respondent-city. Because appellant's right to continue the prior nonconforming use is determined by the uses *257 allowed under the terms of the permit transferred to appellant, we affirm.
FACTS
Appellant AIM Development (USA), LLC (AIM) is a subsidiary of American Iron & Metal, specializing in the demolition of structures and metal recycling. AIM currently owns a former paper mill site and landfill in Sartell, Minnesota. Respondent City of Sartell (Sartell) is a municipality located primarily in Stearns County and is the local permitting authority for the land-use permit at issue in this case.
In 1984, AIM's predecessor-in-title[1] received a permit from the Minnesota Pollution Control Agency (the MPCA) to construct and operate an industrial solid waste land disposal facility in Sartell. The landfill was used to deposit and store waste generated in conjunction with a paper mill, situated at a nearby, but detached location. The permit provided for a 70-acre site, within which 27 acres were engineered for ash disposal. The permit only authorized the deposit of non-hazardous industrial waste. The permittee was required to give advance notice to the MPCA of "alterations or additions" to the facility, or "activity that may result in noncompliance with ... a condition of the permit." The permit was transferrable only with the "express written approval of the MPCA," and provided that "[a] person to whom the permit has been transferred shall comply with the conditions of the permit." The initial permit was valid for a period of five years.
Facilities for the disposal of non-hazardous and nontoxic industrial solid waste, such as the facility approved in the 1984 permit, were considered a permitted use of land in I-1 Light Industrial district in Sartell from 1984 to 1989. During that time, Sartell's zoning ordinance defined "Industrial storage and disposal facility" as "[a] facility permitted by [the MPCA] ... for the disposal of non-hazardous and nontoxic industrial solid waste." "Industrial solid waste" was defined as "[n]on-hazardous, nontoxic waste material resulting from an industrial operation" and explicitly excluded "garbage, refuse and other discarded materials, animal waste, fertilizer or solid or dissolved material from domestic sewage."
Sartell amended its zoning ordinance in 1989. The amendment rendered industrial, non-hazardous landfills a non-permitted use of the land where the landfill was located.[2] While the landfill did not conform to the new zoning ordinance, it continued to operate as a legal nonconforming use in Sartell between 1989 and May 2012, collecting waste generated exclusively in conjunction with the operation of the paper mill. No other industrial waste from any other sources was accepted at the facility between 1984 and 2012.
The MPCA reissued permits for the landfill in 1992, 1997, 2004 and 2009.[3] The *258 1997 permit reissuance application noted that the landfill was only permitted to accept wood yard waste, boiler ash, and scrubber cake from the paper mill. The application limited the use of the landfill as follows: "Public Access: The Solid Waste Storage and Disposal Facility will be used solely by [the permittee] and will not be made available to the public or municipal waste haulers." The application identified certain activities prohibited at the facility, including "[d]isposal of any wastes not identified in [the 1984 permit] without written approval from MPCA." The application noted that the landfill was "privately and solely owned" by AIM's predecessor-in-title, and "[n]o other industrial waste from any other generator is accepted at this facility." The permittee represented that "[o]nly specifically named non-hazardous industrial waste from the Sartell Mill is accepted at this facility. This is limited to boiler ash, boiler scrubber cake, and wood yard waste."
The 2008 permit reissuance application, like the 1997 application, noted that the landfill only accepted certain types of waste materials, including wood yard waste, paper mill bar screenings, wastewater grit, boiler ash, and scrubber cake, generated by the paper mill operations. The application reiterated that the facility was "privately and solely owned" by AIM's predecessor-in-title, and "[n]o other industrial waste from any other generator is accepted at this facility." The application noted that "[o]nly specifically named non-hazardous industrial waste from the Sartell Mill is accepted at this facility," including boiler scrubber cake and wood yard waste. The MPCA approved the application and reissued a final permit in March 2009, expressly limiting waste activities to wood yard waste, paper mill bar screenings, wastewater grit, boiler ash, and scrubber cake generated by the paper mill. The 2009 permit was to expire in March 2014.
AIM's predecessor, Verso, ceased operating the paper mill in May 2012, after the mill was significantly damaged in an explosion and fire. In January 2013, AIM purchased the paper mill site and the landfill from Verso. AIM specializes in the demolition of structures and metal recycling and identifies its "core business [as] metal recycling." And AIM's expressed interest in acquiring the paper mill and landfill was to "salvage out [and] demolish all but [two] buildings down to the ground level and then flip the properties for resale." AIM's witness acknowledged that it has not used the site for any kind of disposal since its purchase, and has no plans to construct a new paper mill on the site of the former paper mill.
In February 2013, Verso and AIM submitted a letter to the MPCA requesting a modification to the 2009 permit "solely to reflect the change in ownership" of the facility to AIM. Neither Verso nor AIM sought any other type of modification to the terms and conditions of the 2009 permit. Instead, the letter notified the MPCA that "[a]ny other Permit modifications occasioned by changes in operation under AIM's ownership" would be pursued by AIM after the transfer. The MPCA reissued the permit in June 2013, authorizing transfer of ownership from Verso to AIM. The permit, as transferred from Verso to AIM in 2013, provided that the facility could only accept certain types of waste, and that no waste from any location other than the paper mill could be deposited in the landfill. AIM's vice president recognized that, as of the date of sale, "only waste coming from [the] Sartell mill was going into that landfill."
In January 2014, AIM submitted an application to the MPCA seeking authority to deposit waste generated from operations *259 other than the paper mill into the landfill. Specifically, AIM sought permission to deposit items including industrial waste, construction and demolition debris, certain medical wastes, dried paints and solvents, aluminum, steel, glass, and hardened construction plastics, without limitation as to the source or nature of the waste. It is uncontested that the 2013 permit transferred from Verso to AIM did not authorize this type of waste in the landfill.
Sartell objected to AIM's permit renewal application on the grounds that AIM had neither applied for nor received local approvals and licenses for operation of the landfill, and that AIM's proposal to deposit non-approved waste materials from outside sources constituted a dramatic change to the nature and source of waste and an expansion of the landfill area. Based on Sartell's objections to the permit renewal application, the MPCA released a public notice of intent to deny AIM's permit application.
AIM then initiated a declaratory-judgment action against Sartell seeking a declaration that AIM was entitled to deposit waste generated from operations other than the paper mill into the landfill. Following cross-motions for summary judgment, the district court issued an order granting in part and denying in part AIM's motion, and granting in part and denying in part Sartell's motion. The district court found that the "use of the landfill is limited to waste generated by the paper mill operation," and that "the disposal of other wastes and wastes from other generators is an unpermitted expansion of the use." The district court further concluded that "a factual issue exists as to abandonment or discontinuance" of the landfill. During a status conference, the district court indicated that the landfill exclusions were intended to exclude any waste from sources other than the paper mill. Because the paper mill had been demolished and AIM had no current plans to construct a paper mill at the site of the demolished paper mill, there were no genuine issues of material fact. In an effort to avoid "the unnecessary time and expenses of a trial," the parties stipulated to the entry of final judgment against AIM. This appeal follows.
ISSUE
Is a landowner's ability to continue a prior nonconforming use limited to the uses allowed under the terms of the land-use permit in effect at the time of the land-use-permit transfer?
ANALYSIS
Summary judgment is appropriate if the record reflects "no genuine issue as to any material fact" and the moving party "is entitled to judgment as a matter of law." Minn. R. Civ. P. 56.01. On appeal, "[w]e review a district court's decision to grant summary judgment de novo to determine whether any genuine issue of material fact exists and whether the district court correctly applied the law." Citizens State Bank Norwood Young Am. v. Brown , 849 N.W.2d 55, 61 (Minn. 2014). The interpretation of a statute or ordinance presents a question of law, which we review de novo. Eagle Lake of Becker Cty. Lake Ass'n v. Becker Cty. Bd. of Comm'rs , 738 N.W.2d 788, 792 (Minn. App. 2007). Appellate courts view the record evidence "in the light most favorable to the party against whom [summary] judgment was granted." Fabio v. Bellomo , 504 N.W.2d 758, 761 (Minn. 1993). "[W]e may affirm a grant of summary judgment if it can be sustained on any grounds." Doe v. Archdiocese of St. Paul , 817 N.W.2d 150, 163 (Minn. 2012).
It is well-settled that "the right to use property as one wishes is subject to *260 and limited by the proper exercise of the police power in the regulation of land use." McShane v. City of Faribault , 292 N.W.2d 253, 257 (Minn. 1980) (citing Euclid v. Ambler Realty Co ., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) ). A zoning ordinance "may constitutionally prohibit the creation of uses which are nonconforming, but existing nonconforming uses must either be permitted to remain or be eliminated by use of eminent domain." County of Freeborn v. Claussen , 295 Minn. 96, 203 N.W.2d 323, 325 (1972). Thus, a property use in existence at the time of an adverse zoning change may continue to exist unless removed or discontinued. See Minn. Stat. § 462.357, subd. 1e (2018).
The statute provides in relevant part that:
(a) Except as otherwise provided by law, any nonconformity, including the lawful use or occupation of land or premises existing at the time of the adoption of an additional control under this chapter, may be continued, including through repair, replacement, restoration, maintenance, or improvement, but not including expansion, unless:
(1) the nonconformity or occupancy is discontinued for a period of more than one year ....
....
(b) Any subsequent use or occupancy of the land or premises shall be a conforming use or occupancy.
Id . The Sartell Code of Ordinances also addresses nonconforming uses and limits expansion of a nonconforming use as follows: "Increased Nonconformity: No such nonconforming use shall be enlarged or increased, nor extended to occupy a greater square footage of land." Sartell, Minn., City Code § 10-13-5 (1997).
The issue here is whether AIM may accept waste from outside sources for disposal at its landfill site, where such activities are outside the terms of the land-use permit that was transferred to AIM when it purchased the property in 2013, but which activities may have been permitted in the original 1984 permit. "When a nonconforming use lawfully exists before an adverse zoning change takes effect, constitutional and statutory protections permit the use to continue." Meleyco P'ship No. 2 v. City of West St. Paul , 874 N.W.2d 440, 443 (Minn. App. 2016) (citation omitted). Generally, the nonconforming use of a property may not be expanded beyond what was present at the time the use became nonconforming. Hawkins v. Talbot , 248 Minn. 549, 80 N.W.2d 863, 865 (1957) ("One limitation traditionally imposed on the right of a governmental body to enact zoning restrictions is that such restrictions must be subject to the vested property interests of lawful businesses and uses already established within the zoned district."). "The general rule is that actual use as distinguished from merely contemplated use when a zoning restriction opposed to it becomes effective is essential to its protection as a lawful nonconforming use." Hawkinson v. County of Itasca , 304 Minn. 367, 231 N.W.2d 279, 283 (1975). When determining whether a landowner is entitled to continue a nonconforming use, it is "the present use of the property which must be the criterion." Id . (looking to the "overt acts," or actual use of the property at the time the use becomes nonconforming, to determine whether use may continue); see also Northgate Homes, Inc. v. City of Dayton , 126 F.3d 1095, 1100 (8th Cir. 1997) (applying Minnesota law and determining that mobile-park owner could not engage in retail sales on property where zoning ordinance prohibited such sales and evidence did not support a finding that at the time the property became nonconforming a "business operation similar to Northgate's *261 existed at the same location").[4]
"An established nonconforming use runs with the land, and hence a change in ownership will not destroy the right to continue the use." 8A Eugene McQuillin, The Law of Mun. Corp . § 25.188, at 59 (3d ed. 2018). "However, generally speaking, the character of the nonconforming use must be the same for the change in ownership not to effect a valid nonconforming use." Id .; see also 2 Am. Law. Zoning § 12:18 (5th ed. 2018) (noting that a nonconforming use generally "may not be changed to a different nonconforming use" if such alterations constitute "substantial changes"). Here, the property was used as a landfill for the paper mill when it became nonconforming. The landfill was a permitted use on the property in 1984. Sartell amended its zoning ordinance in 1989, after which time the operation of a non-hazardous landfill was not a permitted use. AIM's predecessors continued to operate the landfill between 1989 and 2012 as a permitted nonconforming use, limiting their waste materials solely to those generated in conjunction with the operation of the paper mill. The landfill was not used for any purpose other than to accept certain types of paper-product waste from the paper mill as reflected in, and limited by, the 1992, 1997, 2004 and 2009 permits. AIM failed to satisfy its burden of establishing that its predecessors used the landfill as a commercial enterprise accepting both public and private waste. See Northgate Homes, Inc. , 126 F.3d at 1100 (placing burden of proof on landowner). Accordingly, we hold that the district court properly concluded that AIM's proposal to accept waste from other waste sources constitutes an impermissible expansion of the prior nonconforming use.
AIM attempts to avoid the limitations imposed by the 2013 permit by arguing that the landfill has a long history of being used as a non-hazardous industrial waste facility. AIM urges the court to look back to the 1984 ordinance, which broadly defined "industrial solid waste" as "[n]on-hazardous, nontoxic waste material resulting from an industrial operation."[5] AIM argues that the landfill has always been an industrial storage and disposal facility and the district court's characterization of the landfill is too narrow. What AIM's argument ignores-and what we cannot-is that AIM's use of the landfill is limited to the activities approved by the 2013 permit that was transferred to AIM. The permittee, through each successive permit renewal application, expressly limited use of the landfill to certain defined forms of waste material generated by operation of the paper mill. These are the same rights transferred from Verso to AIM after the 2013 sale. Thus, AIM's reliance on the 1984 ordinance is misplaced and cannot be construed so as to grant AIM greater rights *262 than those recognized by the MPCA-approved 2013 permit.
The public policy considerations underlying land-use regulations further support our decision. Minnesota recognizes the principle that "nonconforming uses are to be restricted in a way which will be conducive to their ultimately being phased out." Hawkinson , 231 N.W.2d at 282 (citation omitted); see also Claussen , 203 N.W.2d at 327 (holding that a restriction against expansion is not unreasonable, since it "will enhance the possibility that [the landowner's] nonconforming use will eventually be phased out"); Graham v. Itasca Cty. Planning Comm'n , 601 N.W.2d 461, 466 (Minn. App. 1999) (determining that the county was "pursuing a legitimate governmental purpose" in restricting residential use of land and establishing standard lot sizes). Sartell amended its zoning ordinance in 1989 to restrict the operation of industrial non-hazardous landfills within the city. This land-use restriction is a valid exercise of Sartell's police power and will enhance the possibility that the nonconforming use will ultimately be phased out. See McShane , 292 N.W.2d at 257 ; see also Hawkinson , 231 N.W.2d at 282.
DECISION
Our de novo review of the record, coupled with public policy considerations, compels a conclusion that AIM's proposed expansion of the landfill constitutes an impermissible expansion of the prior nonconforming use. Because the district court did not err in granting summary judgment in favor of Sartell, we affirm.[6]
Affirmed.

Champion International Corporation merged with International Paper Company in January 2001. In August 2006, CMP Holdings LLC purchased the property from International Paper Company. CMP Holdings LLC later changed its name to Verso Paper LLC, and then to Verso Paper Corporation (Verso). AIM acquired the property from Verso in January 2013.

The landfill area remained zoned as Light Industrial. Currently, industrial storage and disposal facilities for non-hazardous and nontoxic industrial waste are only permitted in Sartell's I-2 Heavy Industrial zoning district through a conditional use permit. Industrial solid waste operations and junkyards are not currently permitted in any zoning districts in Sartell.

The record does not contain any application or permit for the time period between 1997 and 2009.

Similarly, we held in an unpublished case that a campground owner was not allowed to continue a prior nonconforming use where the new owner altered the existing use after purchasing the property. State v. Loomis , No. C6-96-1278, 1997 WL 118251, at *2 (Minn. App. 1997) ; see Dynamic Air, Inc. v. Bloch , 502 N.W.2d 796, 800 (Minn. App. 1993) (holding that, although not binding precedent, unpublished opinions may be persuasive).

The original 1984 permit issued by the MPCA indicated that "the permittee shall submit to the [MPCA] a written request for the disposal of any industrial solid waste not listed in Appendix L of the permit application." Neither the district court nor this court have been able to locate Appendix L, and it is unclear what types of waste were originally permitted. Nevertheless, it is clear from the record that subsequent permits-including those issued in 1997 and 2009-explicitly limited waste to that generated in conjunction with operation of the paper mill.

The city argues, in the alternative, that it is further entitled to summary judgment because the undisputed record evidence conclusively demonstrates that AIM discontinued using the landfill for a period of more than one year. See Minn. Stat. § 462.357, subds. 1e(a)(1) (providing that an existing nonconformity may continue unless "the nonconformity ... is discontinued for a period of more than one year"); 1e(b) (providing that subsequent use of property "shall be a conforming use or occupancy"). AIM counters that it continuously used the landfill since purchasing the property in 2013 by maintaining and repairing the site, among other activities. See id ., subd. 1e(a) (providing that "use" may be established through "repair, replacement, restoration, maintenance, or improvement"). Because we affirm on the ground that AIM is not entitled to greater rights than those transferred to it under the plain terms of the 2013 permit, we do not reach this alternative argument.